IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JONATHAN BERRY,                                    Case No. 2:22-cv-2465

     Petitioner,                                   Marbley, C.J.
                                                   Bowman, M.J.
     v.

MIKE MEINTEL/WARDEN,

     Respondent.


**REPORT AND RECOMMENDATION**

     Petitioner, a state prisoner proceeding with the assistance of counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter has been referred to the Undersigned pursuant to 28 U.S.C. § 636(b) and this Court's General Order 22–05.  Pending before the Court are the Petition and its attachments (Doc. 1, 3); Respondent's Return of Writ (Doc. 7); and the state court record (Doc. 6).  Petitioner filed a Reply (Doc. 9).  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the Petition be **DENIED** and that this action be **DISMISSED**.

     The Undersigned further **RECOMMENDS** that the Court decline to issue a certificate of appealability ("COA").

**I.      Procedural History**

     The record reveals the following relevant procedural history.  On February 15, 2019, Petitioner was indicted by a grand jury in the Court of Common Pleas for Union County, Ohio.  (Doc. 6 at PageID # 45-47).  Petitioner was charged with five counts of aggravated trafficking in drugs in violation of Ohio Rev. Code Ann.  § 2925.03(A)(1), §

2925.03(C)(1)(a); and one count of involuntary manslaughter for the death of Ashley

Russell in violation of Ohio Rev. Code Ann. § 2903.04(A), § 2903.04(C). (*Id*.)

A jury trial was held January 13 through 16, 2020. (*Id*. at PageID # 647-1895).

On January 16, 2020, the jury returned a guilty verdict on all six counts. (*Id*. at PageID #

1888-1890).

The Court of Appeals for Ohio's Third District summarized the facts adduced at

trial as follows:

{¶2} Ashley and her two children lived with her parents in Marysville, Ohio. She and her two children moved into her parents' house in Marysville, Ohio after she began battling a drug addiction. Ashley was friends with Berry and would drive him places since he did not have a driver's license. Ashley's mother, Tonya Russell ("Tonya"), suspected that Ashley and Berry were doing drugs together. Tonya texted Berry "[t]o tell him * * * that I knew he was selling her [Ashley] drugs or giving them to her * * * and I wanted it to stop." However, in response, Berry insisted that he was "cutting ties with * * * dope" and that they were just "spending time together."

{¶3} Deputy Rod Wilson ("Deputy Wilson") of the Union County Sheriff's Office testified that he became acquainted with Berry through several complaints that his office had received. In February of 2017, the police conducted a traffic stop of a vehicle and found methamphetamines in the possession of G.C. Pursuant to an agreement with the Union County Prosecutor's Office ("defendant's agreement"), G.C. consented to work with the police as a confidential informant. G.C. would participate in four controlled-buy operations that had Berry as their target.

{¶4} On April 7, 2017, Deputy Wilson issued $80.00 to G.C. to purchase methamphetamines from Berry. G.C. walked to an area behind a local repair shop where he had arranged a meeting with Berry. G.C. returned to Deputy Wilson with $40.00 and a white powdery substance. This substance was later tested and found to contain methamphetamines.

{¶5} On April 27, 2017, Deputy Wilson issued $80.00 to G.C. to purchase methamphetamines from Berry. G.C. walked to a nearby parking lot at a local shopping plaza where he had arranged to meet Berry. G.C. returned to Deputy Wilson with $20.00 and a crystalline substance. This substance was later tested and found to contain methamphetamines.

{¶6} On June 16, 2017, Deputy Wilson issued $80.00 to G.C. to purchase methamphetamines from Berry. G.C. again walked to a nearby parking lot at a local shopping plaza where he had arranged to meet Berry. G.C. returned to Deputy Wilson with a crystalline substance and no excess funds in his possession. This substance was later tested and found to contain methamphetamines. This was the final controlled-buy operation involving Berry before Ashley's death.

{¶7} On June 18, 2017, Berry engaged in a text exchange with Ashley. Ex. 173. Berry texted Ashley: "I got ur Chinese." At trial, Detective Seth McDowell ("Detective McDowell") of the Union County Sheriff's Office testified that "Chinese" is used as a name for a compound that "contains fentanyl, whether it is made up of heroin and/or methamphetamine." During this exchange, Ashley texted, "So how can I get that from you?" Berry then texted, "Give me a few want to wait till on the morning and come get it after u drop ur boys."

{¶8} On June 19, 2017, at 7:40 A.M., the following text exchange took place between Ashley and Berry:

> **[Berry]: I. In town babe I need u**
>
> **[Ashley]: Ok im getting ready to take [my son] to daycare. Where will you be?**
>
> **[Berry]: Parking g lot of the Dollar tree * * ***
>
> **[Ashley]: I am hurrying. My mom doesnt leave until 9 so shes still here.**

At 8:48 A.M., the following exchange occurred:

> **[Ashley]: Did you bring that gor meet**
>
> **[Ashley]: Im righy by yhe YMCA**
>
> **[Berry]: Coming out of house.e depot**
>
> **[Berry]: Home depot**
>
> **[Ashley]: Im here in front of laen mowers**
>
> **[Berry]: Coming**

At trial, the State introduced footage from a security camera at Home Depot that captured images of Berry and Ashley walking together.

3

{¶9} At around 1:00 P.M., Ashley's Aunt, Lisa Crumb ("Crumb"), stopped by Ashley's residence during her (Crumb's) lunch break from work. Crumb testified that she went to Ashley's house to borrow a hair dryer. She further stated that, at the time of her visit, Ashley's children were in the swimming pool. During their conversation, Crumb learned that Ashley had met Berry that morning at Home Depot. After using the hair dryer, Crumb then returned to work.

{¶10} On the afternoon of June 19, 2017, Ashley's aunt, Gayla Wooldridge ("Wooldridge"), was visiting her parents ("Ashley's grandparents") at their house. Ashley's grandparents lived down the street from Ashley. Wooldridge stated that, during her visit, Ashley's six-year-old son came to Ashley's grandparents' house to report "that he thought something was wrong with Ashley." Wooldridge then went to check on Ashley. Wooldridge went to Ashley's house with her nephew, M.R.

{¶11} When Wooldridge arrived at Ashley's residence, the front door was open. Wooldridge walked into the house and went to the upstairs bathroom. The bathroom door was locked, so she and M.R. found the key and opened the door. They then saw Ashley lying on the floor in the bathroom. Ashley was unresponsive and was, by that point, turning blue. Wooldridge then called 9-1-1.

¶12} The emergency squad arrived at Ashley's residence and transported her to the hospital where she was declared dead at 5:07 P.M. Crumb went to the hospital when she heard about Ashley. Crumb spoke with the law enforcement officers who were at the hospital and informed them that Ashley had met Berry that morning at Home Depot.

{¶13} The police examined the bathroom where Ashley was found. Corporal Nathan Stone ("Corporal Stone") discovered a hypodermic needle, a Q-tip with the end ripped off, and a make-up bag behind the bathroom door. He determined that this make-up bag was, based on its contents, a "rig bag." At trial, he explained that a rig bag contains "all the items [a drug user] would need to shoot up, smoke, whatever you want to administer." During the investigation into Ashley's death, the police recovered Ashley's cell phone from her residence. Her cell phone contained text messages that indicated she was a drug user and was in contact with Berry.

{¶14} Corporal Stone also discovered a white powdery substance that was in a plastic baggie that had been placed into another plastic baggie. He stated that this package "looked like * * * it had been packaged for distribution" and looked like it had "never been opened." This white powdery substance was subsequently tested and found to contain fentanyl and ketamine.

4

{¶15} The police decided to have G.C. perform a fourth controlled-buy operation with Berry as part of the investigation into Ashley's death. On June 21, 2017, Deputy Wilson issued $85.00 to G.C. to purchase a gram of methamphetamines from Berry. This time G.C. went to Berry's residence for the drug transaction. During this operation, G.C. spoke with Berry about [Ashley] Russell.

{¶16} A recording of this conversation was admitted at trial. Speaking to G.C., Berry said that he had seen Ashley on the day of her death and that she had given him $15.00 for a ride to Columbus. G.C. returned from Berry's house with a crystalline substance and no excess funds in his possession. This substance was later tested and found to contain methamphetamines.

{¶17} On August 29, 2017, Dr. Bryan D. Casto ("Dr. Casto") conducted a postmortem examination of Ashley's remains.  He concluded that the cause of Ashley's death was "[m]ultiple drug intoxication (fentanyl, amphetamine/ methamphetamine)." On September 5, 2017, Dr. David Applegate ("Dr. Applegate"), the Union County Coroner, determined that Ashley's death had been an accident, having resulted from a drug overdose.

{¶19} …At trial, the State called G.C. to testify. However, G.C. invoked his Fifth Amendment right against self-incrimination and refused to testify. The State then granted G.C. immunity "as it relates to, one, any questions asked by the prosecutor this afternoon; and, two, specifically as it relates to any events" connected to the four controlled-buy operations. The trial court then informed G.C. that he did not have a Fifth Amendment right against self-incrimination in this context and that he must testify or be found in contempt. However, G.C. still refused to testify. The trial court then held G.C. in contempt.

*State v. Berry*, 2021 WL 1245031 at *1-4 (Ohio Ct. App. Apr. 5, 2021) (internal citations omitted) (emphasis in original); (Doc. 6 at PageID # 304-312). After his conviction on five counts of aggravated drug trafficking and one count of involuntary manslaughter, the trial court sentenced Petitioner on March 6, 2020, to an aggregate sentence of seventeen years' incarceration. (*Id.* at PageID # 1934).

Petitioner appealed his convictions and sentence.  He raised ten assignments of error: (1) the record contained insufficient evidence to support a conviction for aggravated possession of drugs in violation of Ohio Rev. Code § 2925.03 and for

5

involuntary manslaughter in violation of Ohio Rev. Code Ann. § 2903.04; (2) the conviction for aggravated possession of drugs in violation of Ohio Rev. Code Ann. § 2925.03[1] and for involuntary manslaughter in violation of Ohio Rev. Code Ann. § 2903.04 was contrary to the manifest weight of the evidence; (3) the trial court erred when it failed to give any jury instruction regarding causation; (4) the trial court erred when it failed to grant a mistrial after the jury was tainted by the statements from a potential juror; (5) the trial court erred when it failed to grant a mistrial or a continuance due to late disclosure of the confidential informant's agreement; (6) the trial court incorrectly ruled as it pertained to confidential informant's constitutional right against self-incrimination and the subsequent criminal contempt findings prejudiced appellant; (7) the trial court erred when it allowed text messages to be entered in violation of [Petitioner's] confrontation clause and where hearsay was offered for the truth of the matter asserted; (8) the trial court erred when it allowed family members to be present during the trial prior to their testimony being given in violation of any separation of witnesses; (9) [Petitioner] was denied his constitutional right to the effective assistance of counsel; and (10) the trial court erred when [Petitioner] received the maximum sentence. *Berry*, 2021 WL 1245031 at *4; (Doc. 6 at PageID # 312-314).

On April 6, 2021, the appellate court overruled Petitioner's assignments of error and affirmed Petitioner's conviction. (*Id*. at PageID # 303-375.) On May 21, 2021, Petitioner filed an appeal in the Ohio Supreme Court and raised five issues for review:

> Proposition of Law No. 1: It is against the sufficiency and manifest weight of the evidence to find a defendant guilty of aggravated possession of methamphetamine when the only evidence of such trafficking was text

---

[1]    On appeal, Petitioner challenged only one count of aggravating trafficking of drugs (Count 4), which pertained to the June 19, 2017, transaction between Petitioner and Ashley Russell.

messages using the general term of "Chinese" and the drugs recovered from the scene did not contain methamphetamine.

Proposition of Law No. 2: It is against the sufficiency and manifest weight of the evidence to find a defendant guilty of involuntary manslaughter when the predicate felony offense of aggravated possession of methamphetamine has not been established.

Proposition of Law No. 3: A defendant is denied a right to a fair trial on the charge of involuntary manslaughter when the only jury instruction given on said charge was "proximate result."

Proposition of Law No. 4: The Third Appellate District's Decision in *State v. Berry*, 2021--Ohio 1132, is in conflict with the Fifth Appellate District's Decisions in *State v. Kosto*, 2018-Ohio-1925, and the Ohio Supreme Court should resolve this conflict.[2]

Proposition of Law No. 5: A defendant is denied a right to a fair trial when a violation of the separation of witnesses has occurred because multiple family members that testified attended the jury trial and were present during the testimony of witnesses.

(Doc. 6 at PageID # 389, 391, 392, 394).

On August 3, 2021, the Ohio Supreme Court declined to accept jurisdiction over Petitioner's appeal. *State v. Berry*, 2021-Ohio-2615, 163 Ohio St. 3d 1516, 171 N.E. 3d 350 (table); (Doc. 6 at PageID # 486).

On June 13, 2022, Petitioner, with the assistance of counsel, sought a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1, 3). The petition raises the following grounds for relief:

Ground One: There was insufficient evidence to support Petitioner's convictions for aggravated trafficking (Count 4) and involuntary manslaughter).

Ground Two: Petitioner's Sixth Amendment right to confront the witnesses against him were violated because: (1) Ashley Russell's family was allowed

---

[2]     Petitioner argued that *State v. Kosto* required the state to prove that the drug involved in the predicate offense for involuntary manslaughter would have solely been the cause of death, notwithstanding the presence of other drugs. (Doc. 6 at PageID # 394).

to remain in the courtroom despite being trial witnesses, and (2) Petitioner was unable to cross-examine the state's confidential informant when the informant exercised his Fifth Amendment right to remain silent.

Ground Three: Petitioner's trial counsel was ineffective.

Ground Four: Petitioner's due process rights were violated because the jury was improperly instructed on proximate cause for the involuntary manslaughter charge.

(*Id.*) (rephrased for clarity).

## II. THE PETITION SHOULD BE DENIED.

In this federal habeas case, the applicable standard of review governing the adjudication of constitutional issues raised by petitioner to the state courts is set forth in 28 U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011)(quoting *Williams v. Taylor,* 529 U.S. 362, 412–13 (2000)). "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the

Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 599–600 (quoting *Williams*, 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet. *Id.* at 600. As the Sixth Circuit explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g., Cullen v. Pinholster,* __ U.S. __, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*. . .. This is a "substantially higher threshold." . . . To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter,* __ U.S. __, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

654 F.3d 594 (emphasis in original). The Supreme Court extended its ruling in *Harrington* to hold that when a state court rules against a defendant in an opinion that "addresses some issues but does not expressly address the federal claim in question," the federal habeas court must presume, subject to rebuttal, that the federal claim was "adjudicated on the merits" and thus subject to the "restrictive standard of review" set out in § 2254(d). *See Johnson v. Williams*, 568 U.S. 289, 293 (2013).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with

[Supreme Court] precedents." *Harrington*, 562 U.S. at 102.  In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Decisions by lower courts are relevant "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte*, 654 F.3d at 600 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).  The writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins*, 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams*, 529 U.S. at 412).

### A.    Procedural Default—Grounds Two, Three, and Four

As a preliminary matter, the Court will address Respondent's argument that Grounds Two, Three, and Four are procedurally defaulted.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c); *see also O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Leroy v. Marshall*, 757 F.2d 94, 97, 99–100 (6th Cir. 1985). If the petitioner fails to fairly present his constitutional

claims through the requisite levels of state appellate review to the state's highest court or commits some other procedural default that prevents a merit-based review of the federal claims by the state's highest court, he may have waived the claims for purposes of federal habeas review. *See O'Sullivan*, 526 U.S. at 847–48; *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant*, 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz*, 888 F.2d 1097, 1099 (6th Cir. 1989).

In order to satisfy the "fair presentation" requirement, a habeas corpus petitioner must present both the factual and legal underpinnings of his claims to the state courts. *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000); *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987). "While a petitioner need not cite chapter and verse of constitutional law, general allegations of the denial of rights to a fair trial and due process do not fairly present claims that specific constitutional rights were violated." *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017)

A set of four guidelines has been developed for determining whether a claim was presented in such a way as to alert the state courts of the claim's federal nature. *McMeans*, 228 F.3d at 681. Under those guidelines, the fair presentation requirement is satisfied if the petitioner raised the federal issue in the state courts by (1) relying on federal cases employing constitutional analysis; (2) relying on state cases employing constitutional analysis in similar factual contexts; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *Id.* (citing *Franklin*, 811 F.2d at 326).

It is well-settled under the procedural default doctrine that the default of a federal claim in the state court may preclude federal habeas review if the state court judgment rests on a state-law ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the state court's decision. *See Harris*, 489 U.S. at 260–62. The Supreme Court has stated:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default, and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The Sixth Circuit applies a four-part test to determine if a claim is procedurally defaulted:

> (1) the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule; (2) the court must determine whether the state courts actually enforced the state procedural sanction; (3) it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).

In the usual case, the adequate and independent state ground doctrine will not apply to bar consideration of a federal claim on habeas corpus review unless the last

12

state court rendering a judgment in the case "clearly and expressly" states that its judgment rests on a state procedural bar. *Harris*, 489 U.S. at 263. In cases where the last state court to render a reasoned opinion explicitly relies on a procedural bar, the court will presume that a later unexplained order did not silently disregard the procedural default and consider the merits of the claim. *Ylst v. Nunnemaker,* 501 U.S. 797, 803-04 (1991).

In addition, the rule precluding federal habeas corpus review of claims rejected by the state courts on state procedural grounds applies only in cases where the state rule relied on by the courts is deemed "adequate" or, in other words, involves a "firmly established and regularly followed state practice" at the time that it was applied. *Ford v. Georgia,* 498 U.S. 411, 423-24 (1991). To be considered regularly followed, a procedural rule need not be applied in every relevant case, but rather "[i]n the vast majority of cases." *Dugger v. Adams,* 489 U.S. 401, 410 n.6 (1989).

Finally, the state court's adequate and independent finding of procedural default will preclude habeas corpus review of the petitioner's federal claims unless the petitioner can show "cause" for the default and "actual prejudice" as a result of the alleged violations of federal law, or that failure to consider the federal claims will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *Harris*, 489 U.S. at 262; *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986).

Respondent contends that Ground Two is procedurally defaulted because: (1) it is unexhausted, and (2) it is barred by the independent and adequate state ground doctrine. (Doc. 7 at PageID # 528-535). Respondent contends that Ground Three is

procedurally defaulted because it is unexhausted, and Ground Four is barred by the independent and adequate state ground doctrine. (*Id.* at PageID # 536–537, 538–544).

### (i)    Exhaustion

The record reflects that Petitioner failed to exhaust, and thus procedurally defaulted, Grounds Two and Three of his petition.

As noted above, Petitioner's Ground Two has two sub-parts. The first sub-part contends that Petitioner was denied his right to confront witnesses against him because multiple members of the victim's family were exempt from sequestration and remained in the courtroom during the trial proceedings. Petitioner raised the issue as Assignment of Error No. 8 in his brief to the appellate court and Proposition of Law No. 5 in his brief to the Ohio Supreme Court. (Doc. 6 at PageID # 200-202; 394-397). However, Petitioner relied solely on Ohio jurisprudence and statutory law in support of his arguments. (*Id.*). Petitioner did not rely on federal or state cases employing constitutional analysis. Rather, he argued that the trial court misinterpreted Ohio's statute known as "Marsy's Law" by permitting multiple members of the victim's family to remain in the courtroom during trial proceedings instead of just one victim representative. (*Id.*)

Petitioner argues that he fairly presented his "Marsy's law" argument to the Ohio state courts as a constitutional claim because he cited Ohio Evid. R. 615, which is based on Fed. R. Evid. 615. (Doc. 9 at PageID # 571).  However, a claim in state court based on a state evidentiary rule is insufficient to apprize the state court of the constitutional nature of claim. *See Jamison v. Collins*, 100 F. Supp. 2d 521, 580 (S.D. Ohio 1998) (citing *Duncan v. Henry,* 513 U.S. 364, 365 (1995)}. The Court cannot

14

conclude that Petitioner phrased his claims in terms of constitutional law or the Confrontation Clause to the Ohio courts. Because Petitioner failed to provide the state's highest court with an opportunity to correct the alleged violations of his constitutional rights, he procedurally defaulted and has waived the ground for relief.

The second part of Ground Two contends that Petitioner was denied the right to confront a witness against him because the state's confidential informant ("CI") exercised his Fifth Amendment rights during his trial testimony.  The trial record reflects that the state utilized a CI to assist in four controlled drug buys with Petitioner. The CI was called by the prosecution to testify at trial. (Doc. 6 at PageID #1023-1070). A few questions into direct examination, the CI exercised his Fifth Amendment right against self-incrimination. (*Id.* at PageID #1035). The judge recessed the trial so that the CI could consult with counsel. When the proceedings resumed, the CI continued to refuse to answer the state's questions, even though he was granted immunity. (*Id.* at PageID # 1059-1070). After the CI was excused from the witness stand, the trial judge had him arrested for contempt of court and the CI remained jailed until the conclusion of the trial. (*Id.* at PageID # 1069-1070; 116-117).

In Ground Three, Petitioner contends that his trial counsel was ineffective for failing to cross-examine the CI, request a jury instruction on causation, hire expert witnesses, adequately respond to the state's motions, object to the presence of the victim's family in court, prepare and file a sentencing memorandum, and file a motion to sever the counts into two separate trials.[3] (Doc. 1 at PageID # 8, 16).

---

[3]     The Petitioner also alleges that his counsel divulged privileged information to the state but provides no further details.

The record reflects that the second part of Ground Two and Ground Three were not raised by Petitioner in his direct appeal brief to the Ohio Supreme Court. *See Leroy*, 757 F.2d at 97 (failure to raise a claim on direct appeal in the Ohio Court of Appeals or in the Ohio Supreme Court constitutes a procedural default). Petitioner argues that ineffective assistance of counsel "indisputably" was argued to the Ohio Supreme Court. The Court disagrees. Petitioner's brief does not argue that his trial counsel engaged in any deficient performance or that Petitioner is entitled to relief based on his trial counsel's performance. (Doc. 6 at PageID # 379-399).

Ohio's doctrine of *res judicata* now bars Petitioner's ability to attempt to raise these claims again. *See State v. Perry*, 10 Ohio St. 2d 175 (1967) (holding that claims must be raised on direct appeal, if possible, or they will be barred by the doctrine of *res judicata.*); *see, e.g., Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998) (finding that the doctrine of *res judicata* applies to constitutional claims that could have been raised on direct appeal) (citing *State v. Combs*, 100 Ohio App. 3d 90 (1994)).  The second sub-part of Ground Two and Ground Three are therefore unexhausted and procedurally defaulted.

### (ii)     *Independent and Adequate State Ground*

Petitioner committed a procedural default of the claims asserted in the first sub-part of Ground Two (Marsy's law) and Ground Four (improper jury instruction) by failing to object to the alleged errors at trial. Ohio's contemporaneous objection rule is a firmly established, adequate and independent state procedural rule, which serves to foreclose federal habeas review when relied on by the state courts as a basis for denying relief. *See, e.g., Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011) (citing *Hinkle v.*

16

*Randle*, 271 F.3d 239, 244 (6th Cir. 2001)); *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005). The Sixth Circuit has repeatedly held that "plain error" review by the state appellate court "constitutes enforcement of Ohio's contemporaneous objection rule." *See Williams v. Bagley*, 380 F.3d 932, 968–69 (6th Cir. 2004) (and Sixth Circuit cases cited therein); *see also Goodwin*, 632 F.3d at 315.

The Ohio Court of Appeals clearly enforced the state procedural bar by reviewing petitioner's assignments of error under plain error analysis. (*See* Doc. 6 at PageID #361 (Ground Two); PageID # 335-341 (Ground Four)). Therefore, the claims alleged in the first sub-part of Ground Two and in Ground Four of the petition are procedurally defaulted.

### (iii.) Cause and Prejudice/Fundamental Miscarriage of Justice

In his response to the Respondent's arguments that Grounds Two, Three, and Four are procedurally defaulted, Petitioner does not argue that the procedural default should be excused through "cause and prejudice." (Doc. 9).[4] Instead, Petitioner makes a passing reference that he is "actually innocent."

To establish a credible claim of actual innocence sufficient to excuse his procedural default, Petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo,* 513 U.S. 298, 324 (1995). Petitioner must also show "it is more likely

---

[4]     Petitioner does not assert ineffective assistance of appellate counsel as "cause" for the default of his ineffective assistance of trial counsel claim. Petitioner specifically rejects the idea that ineffective assistance of appellate counsel caused the default of Ground Three, instead arguing the claim is not procedurally defaulted. (*Id.* at PageID #576-577).

than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt" in light of all the evidence, including that evidence alleged "to have become available only after the trial." *Id.* at 327–28. "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 329. The Court notes that actual innocence, which would permit collateral review of a procedurally defaulted claim, means factual innocence, not mere legal insufficiency. *Bousley v. United States,* 523 U.S. 614, 623 (1998); *see also Hilliard v. United States,* 157 F.3d 444, 450 (6th Cir. 1998). The actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Schlup,* 513 U.S. at 321.

Petitioner has failed to establish a credible claim of actual innocence under the *Schlup* standard. Petitioner makes the single unsupported assertion, "Jonathan Berry is actually innocent but remains incarcerated; therefore a fundamental miscarriage of justice has occurred as a result of the constitutional violations he has suffered." (Doc. 9 at PageID # 576).  He has not supported his allegations of constitutional error with any new evidence of actual innocence. "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup,* 513 U.S. at 316. Petitioner has not demonstrated that his procedural defaults should be excused under the "fundamental miscarriage of justice" exception. Therefore, Petitioner has procedurally defaulted and waived the claims raised in Grounds Two, Three, and Four of the petition.

**B.    Merits Review—Ground One**

In Ground One, Petitioner contends that the evidence was insufficient to sustain his convictions for involuntary manslaughter of Ashley Russell, and the predicate offense of aggravating drug trafficking. Particularly, Petitioner argues that he was convicted of trafficking in methamphetamine, but the only drugs found at the scene of Russell's overdose were fentanyl and ketamine, which undermines the proof for both aggravated drug trafficking and involuntary manslaughter. (Doc. 1 at PageID # 5, 16).

The Ohio Court of Appeals found that the evidence was sufficient to support the conviction for aggravated trafficking in drugs, which requires proof that Petitioner sold or offered a controlled substance. (Doc. 6 at PageID # 315). The Court of Appeals identified the following trial evidence which supported the aggravated drug trafficking conviction:

Text messages were exchanged between Ashley Russell and Petitioner on June 18, 2017, and June 19, 2017, arranging a drug transaction. (Doc. 6 at PageID # 315-317; Tr. Transcript at PageID #1687-1701). Petitioner sent Russell a text which said, "I got ur Chinese." (Doc. 6 at PageID # 316; Tr. Transcript at PageID #1685). Detective McDowell and Corporal Stone testified that in drug vernacular "Chinese" is used to describe fentanyl mixed with heroin or methamphetamine. (Doc. 6 at Page ID # 361-317; Tr. Transcript at PageID # 1685, 1647-1648). Additional text messages were exchanged between Russell and Petitioner during which Russell learns that Petitioner's girlfriend was nodding off at dinner, apparently intoxicated. (Doc. 6 at PageID # 317-318, Tr. Transcript at PageID # 1687-1688). Petitioner assures Russell that the drugs were meant for her, but his girlfriend saw them. (Doc. 6 at PageID # 317-318; Tr.

Transcript at PageID #1687.). Payment for the drugs were discussed in a text string, where Petitioner set the price as "two tens and a thong." (Doc. 6. at PageID # 318; Tr. Transcript at PageID #1688-1689). Corporal Stone testified that it was not uncommon in drug transactions for payment to be made with services or photos of body parts. (Doc. 6 at PageID # 319; Tr. Transcript at PageID #1689). Another text string discussed a meeting between Russell and Petitioner on June 19, 2017, at Home Depot. (Doc. 6 at PageID # 321; Tr. Transcript at PageID #1698-1700). Security footage from the Home Depot and testimony from Russell's aunt, Lisa Crum, confirmed that Russell met Petitioner at the Home Depot that morning. (Doc. 6 at PageID # 322; Tr. Transcript at PageID # 1525, 1656-1658). Detective McDowell testified that he interviewed Petitioner, who admitted that he had a source for "Chinese" named Dutch, who sold it to him for $20. (Doc. 6 at PageID # 323; Tr. Transcript at PageID # 1574-1575). Lastly, crime lab technician Jennifer Watson testified that the substance in a white bag found at the scene of Russell's overdose included fentanyl and ketamine. (Doc. 6 at Page ID # 323; Tr. Transcript at PageID #1293-1294).

Likewise, the Ohio Court of Appeals found the evidence sufficient to support the conviction for involuntary manslaughter, noting that proof requires evidence the defendant (1) caused the death of another, (2) as a proximate result, (3) of the offender's committing a felony. (Doc. 6 at PageID # 324). The Court of Appeals first recognized that the third element was met because there was sufficient evidence to sustain the conviction for aggravated drug trafficking. For the first and second elements, the Court of Appeals found that the following evidence supported the conviction:

Dr. Bryan Casto, forensic pathologist who performed the autopsy, testified that Ashley Russell died from an accidental overdose from multiple drug intoxication with fentanyl and amphetamine/methamphetamine. (Doc. 6 at PageID # 325; Tr. Transcript at PageID #1394-1395). Chief toxicologist at the Montgomery County Coroner's Office, Dr. Matthew Juhascik, testified that fentanyl and methamphetamine was found in Ashley Russell's system. (Doc. 6 at PageID # 325; Tr. Transcript at PageID #1369). Union County Coroner, Dr. David Applegate, testified that the official cause of death was accidental overdose. (Doc. 6 at PageID # 325; Tr. Transcript at PageID #1460-1461). Corporal Stone testified that an unused bag of drugs and drug paraphernalia were found within the proximity of Ashley Russell's body at the overdose scene. (Doc. 6 at PageID # 326; Tr. Transcript at PageID #1625-1626, 1640, 1729-1730).

The well-settled standard of review for evaluating the merits of constitutional claims challenging the sufficiency of the evidence was established by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). The Supreme Court held in *Jackson*, because the Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense, "the relevant question" in assessing the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

Under the *Jackson* standard, the State is not required to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting

21

inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution." *Id.*; *see also Walker v. Engle*, 703 F.2d 959, 969–70 (6th Cir. 1983). It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson*, 443 U.S. at 319. Consequently, the reviewing court is not permitted to reweigh the evidence, reevaluate the credibility of witnesses, make its own subjective determination of guilt or innocence, or otherwise substitute its opinion for that of the jury. *See id.* at 318–19 & n.13; *see also United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (citing *Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009)).

Moreover, federal habeas review of a claim challenging the sufficiency of the evidence is even further limited. As the Sixth Circuit explained in *Brown*, the federal habeas court is "bound by two layers of deference to groups who might view facts differently than [the habeas court] would." 567 F.3d at 205. The federal habeas court must defer not only to the trier of fact's findings as required by *Jackson*, but under 28 U.S.C. § 2254(d), must also "defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis in original); *see also Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011). The Sixth Circuit went on to emphasize in *Brown*:

> [W]e cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt. We cannot even inquire whether *any* rational trier of fact would conclude that petitioner...is guilty of the offenses for which he was charged. Instead, we must determine whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could

> find [the petitioner] guilty beyond a reasonable doubt based
> on the evidence introduced at trial.

567 F.3d at 205 (emphasis in original).

Applying the double-layer deferential standard to the case-at-hand, the undersigned is convinced that the Ohio Court of Appeals' sufficiency determination is neither contrary to nor an unreasonable application of *Jackson*. The Ohio Court of Appeals found evidence to support every element of each offense. To the extent that Petitioner argues that there is conflicting evidence or a lack of direct evidence that he sold the drugs to Ashley Russell resulting in her death, "[c]ircumstantial evidence alone is sufficient to support a conviction and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000)). Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the petitioner is guilty of the charged crime. *Newman*, 543 F.3d at 796–97 (and Sixth Circuit cases cited therein). It is "the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

Viewing the evidence in the light most favorable to the prosecution, the Ohio courts reasonably determined that a rational trier of fact could have found the essential elements of the challenged offenses beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. The Ohio Court of Appeals' adjudication of petitioner's sufficiency of evidence claim therefore involved a reasonable application of the *Jackson* standard and was based on a reasonable determination of the facts in light of the evidence presented at

23

trial. Accordingly, petitioner is not entitled to federal habeas relief based on his sufficiency of evidence claim in Ground One of the petition.

The Undersigned finds that Petitioner is not entitled to habeas relief. Having found that Petitioner's grounds for relief are either procedurally defaulted or fail on the merits, the petition (Doc. 1, 3) should be **DENIED**.

## IT IS THEREFORE RECOMMENDED THAT:

1.      Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1, 3) be **DENIED** with prejudice.

2.      A certificate of appealability should not issue with respect to the petition because petitioner has not stated a "viable claim of the denial of a constitutional right" or presented an issue that is "adequate to deserve encouragement to proceed further." *See Slack v. McDaniel*, 529 U.S. 473, 475 (2000) (*citing Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3.      With respect to any application by a petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore **DENY** any petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

 *s/Stephanie K. Bowman*
 Stephanie K. Bowman
 United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JONATHAN BERRY,                                Case No. 2:22-cv-2465

    Petitioner,                                Marbley, J.
                                               Bowman
    v.

MIKE MEINTEL/WARDEN,

    Respondent.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).